UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOM TOTTE, CODY HITCH and
JOHN MERRELL, individually and
on behalf of others similarly situated,

    Plaintiffs,

v.                                                                                                              Case No. 16-12850

QUICK LANE OIL & LUBE, INC., a
Michigan for-profit company, and
TALHA HARES, its owner,

    Defendants.                                                                           HON. AVERN COHN

_____/

**<u>DECISION GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF A COLLECTIVE ACTION UNDER THE FAIR LABOR STANDARDS ACT, (Doc. 7)</u>**

### I.   INTRODUCTION

#### A.   The Case

This is a Fair Labor Standards Act (FLSA) case. Plaintiffs Tom Totte, Cody Hitch and John Merrell are former employees of Defendant Quick Lane Oil & Lube, Inc. (Quick Lane), an oil change business. Quick Lane operates two locations, each in southeast Michigan. Plaintiffs are suing Quick Lane and its owner Talha Hares for failure to compensate them properly for all time worked.

Plaintiffs first assert overtime violations. They say Totte and Hitch received a weekly salary that was not equivalent to minimum wage plus overtime pay for hours worked. Additionally, Totte and Merrell received hourly wages that did not account for

all time worked including overtime.  Second, plaintiffs assert failure to pay minimum wage.  They say Hitch and Merrell received a weekly salary, and hourly wages, at a rate of pay less than the minimum wage ($7.25) for hours worked.[1]

### B.     Procedural History and Motion

On August 2, 2016, plaintiffs filed their complaint.  (Doc. 1).  Attached were time sheets and/or paystubs of Quick Lane for Totte, Hitch and Merrell.

On October 4, 2016, plaintiffs filed a pre-discovery motion for conditional certification of a collective action, defined below, under the FLSA.  (Doc. 7).[2]  In support, they attached (1) declarations of Totte and Hitch regarding pay and hours at Quick Lane; and (2) Quick Lane time sheets and/or paystubs for Totte, Hitch and Merrell.

As instructed by the Court, the parties have also submitted matrices of hours worked and pay received, by week, for each plaintiff.  (*See* attached Exhibits A, B).[3]

On November 23, 2016, plaintiffs filed an amended complaint.  (Doc. 15).  On February 8, 2017, each defendant answered separately.  (Docs. 24, 25, 26).

### C.     Disposition of Motion

For the reasons explained below, plaintiffs' motion is GRANTED.  The Court will separately enter an order regarding collective action procedures attached to which will be the form of the opt-in notice to be sent to potential plaintiffs.

---

[1] Plaintiffs assert a stand-alone FLSA claim against Hares as a corporate officer.

[2] On December 7, 2016, the Court entered an order tolling the limitations period for any collective-action claims pending disposition of the motion.  (Doc. 18).

[3] Plaintiffs note the matrix is limited to time periods in which both time sheets and paystubs were available as not all have been produced.  (Doc. 19 at 2).

Within 30 days of entry of this decision, plaintiffs, after conferring with defendants, shall lodge with the Court a draft of the proposed order and form of notice. If there are objections, within 21 days of receipt, defendants shall lodge with the Court a redlined version with additions, deletions or modifications to the text in another color.

## II.   COMPLAINT AND ANSWER

In the complaint and answer the parties dispute key facts relating to plaintiffs' pay and hours while working at Quick Lane. They are summarized below, by plaintiff.

### A.   Tom Totte

#### 1.   Employee Classification

Totte was employed as an oil change technician, *i.e.*, an hourly employee not exempt under the FLSA. (Doc. 15 ¶¶ 16, 21). Defendants say he was a manager and exempt. (Doc. 24 ¶ 7).

#### 2.   Salary

Totte was paid a weekly salary of $450, by check, from 2013 to December 2015. (Doc. 15 ¶ 17). Defendants say he was paid $700 per week (excluding bonuses), $450 by check and the rest in cash. (Doc. 24 ¶ 17).[4]

#### 3.   Hourly Pay

For December 2015, Totte was paid, by check, an hourly rate of $8.15, and then $8.75 for January 2016 and on. (Doc. 15 ¶¶ 18-20). Defendants say he "received a check based on the number of hours he worked at minimum wage and . . . the balance . . . in cash." (Doc. 24 ¶ 17).

---

[4] Paystubs from 2013 and 2014 reflect a salary of $500, and those from 2015 reflect a salary of $450. (Doc. 7-9). Totte states in his declaration that his salary was decreased to $450 after leaving Quick Lane for a month in April 2013. (Doc. 7-6 at 2).

3

#### 4.     Hours

Totte "regularly" was not paid for all hours worked, as shown in his time sheets, including for overtime.  (Doc. 15 ¶¶ 24-27).  Defendants "den[y] . . . Totte worked any hours for which he was not compensated."  (Doc. 24 ¶ 27).

### B.     Cody Hitch

#### 1.     Job Description

Hitch is an oil change technician.  (Doc. 15 ¶ 8).  Defendants say he is a "greeter" of customers who does not change oil.  (Doc. 24 ¶ 8; *see also* Doc. 27 at 10).

#### 2.     Pay

Hitch was paid a weekly salary of $350, all in cash, during his employment.  (Doc. 15 ¶ 31).  Defendants say Hitch was paid $450 per week (excluding bonuses), all in cash, during his employment.  (Doc. 24 ¶ 31).

#### 3.     Hours

Hitch was underpaid as he "regularly" worked over 40 hours per week.  (Doc. 15 ¶¶ 32-33).  Defendants deny this.  (Doc. 24 ¶¶ 32-33).

### C.     John Merrell

#### 1.     Pay

Merrell was paid an hourly rate of $8.75, by check, during his employment.  (Doc. 15 ¶ 37).  Defendants say he was paid a weekly salary of $575 (excluding bonuses), part by check and part in cash, during 2014.  (Doc. 24 ¶ 37).  Merrell's salary increased in 2015 to $625, and again to $650.  (*Id.*).

**2.      Hours**

Merrell "regularly" was not paid for all hours worked, as reflected in his time sheets showing over 40 hours while paystubs show less than 30.  (Doc. 15 ¶¶ 38-39). Defendants deny this.  (Doc. 24 ¶¶ 38-39).

### III.      LEGAL STANDARD

The standard for conditional certification of a collective action under the FLSA is well-established.  The Court adopts the recitation from *Cason v. Vibra Healthcare*, 2011 WL 1659381, at *1-2 (E.D. Mich. 2011) (O'Meara, J.):

> Under the FLSA, an employee may sue on her own behalf and on behalf of others "similarly situated." *See Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544, 546 (6th Cir. 2006). Section 216(b) of the FLSA establishes two requirements for a representative action: 1) the plaintiffs must actually be "similarly situated," and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action. *Id.;* 29 U.S.C. § 216(b).
>
> Certification of an FLSA action generally proceeds in two phases; the first at the beginning of discovery, and the second at the completion of discovery. *See Comer,* 454 F.3d at 546. The first stage involves conditionally certifying a class for notice purposes, so that potential plaintiffs have the opportunity to opt in. *Id.* At this stage, certification is "conditional and by no means final." *Id.* (citation omitted). "This initial standard is fairly lenient, and in order to meet this standard, Plaintiffs must simply submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists." *Olivo v. GMAC Mortgage Corp.,* 374 F.Supp.2d 545, 548 (E.D. Mich. 2004) (internal quotations omitted). "[I]t is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien v. Ed Donnelly Enters.,* 575 F.3d 567, 584 (6th Cir. 2009).
>
> At the first stage of the analysis, the "Court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Wlotkowski v. Michigan Bell Tel. Co.,* 267 F.R.D. 213 (E.D. Mich. 2010) (Edmunds, J.). Plaintiffs seek this type of conditional certification here. "At the second stage, following discovery,

trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer,* 454 F.3d at 546.

As to "similarly situated," the Court adopts the discussion found in *Cobus v. DuHadway, Kendall & Assocs., Inc.,* 2014 WL 4181991, at *3 (E.D. Mich. 2014) (Levy, J.):

> The FLSA does not define "similarly situated." But plaintiffs must show "only that [their] position is similar, not identical, to the positions held by the putative class members." *Comer,* 454 F.3d at 546-47. Plaintiffs can meet this burden by showing that "they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Id.* at 585. "Showing a unified policy of violations is not required, though." *Id.* at 584. Alternatively, plaintiffs can show their claims are "unified by common theories of defendant's statutory violations, even if the proofs of those theories are inevitably individualized and distinct." *Id.* at 585.

### IV. MOTION

#### A. Proposed Collective Action

Plaintiffs seek conditional certification of a following collective action:

*All current and former employees who worked for the Defendants as oil change technicians within the last three years and who were not compensated for all hours worked including the one and one-half the regular rate for hours in excess of 40 in a workweek.*

(Doc. 7 at 9). Plaintiffs do not state how many employees are included in this proposed collective action.[5] None have yet opted in.

#### B. Declarations

##### 1. Totte

In his declaration, Totte states he was paid a weekly salary of $450, by check, from 2013 to December 2015 regardless of hours worked. (Doc. 7-6 at 2). Afterward,

---

[5] Plaintiffs state "the number of oil change technicians that could opt-in to this collective action are too many in number to make joinder practicable." (Doc. 7 at 16).

6

he was paid hourly and his checks were for "exactly 40 hours a week" even though he worked more hours than that as reflected in his time sheets. (*Id.* at 3).

Totte worked primarily at a single location. Occasionally he worked as back-up at the second location and was paid in the same way. (*Id.*). It was standard procedure for oil change technicians to work 6 days a week in all-day shifts for the following hours:

| | | |
|---|---|---|
| Mon-Fri | 8am - 7pm | (11 hours) |
| Sat | 8am - 6pm | (10 hours) |
| Sun | 9am - 5pm | (8 hours) |

(*Id.* at 2). Until the end of 2015, Quick Lane "only paid a flat rate of pay per week to all of [its] workers at [its] oil change shops, regardless of the number of hours worked." (*Id.*). Pay and hourly work were the same at each location. (*Id.* at 3). Explaining how he knew of other employees' pay and hours, Totte states:

> When someone leaves, all of the employees bargain over who gets that person's day off and everyone switches their one day off they get a week. This is common knowledge. All of the employees know that everyone only gets one day off a week. We see each other practically every day and talk about our schedules regularly.
>
> When we were being paid on a weekly rate, I know that most of the people that I work with made less money than I did. I know this because, when a new person was hired everyone would talk about how much money they were being paid a week.

(*Id.* at 2).

### 2.   Hitch

In his declaration, Hitch states he was paid a weekly salary of $300,[6] in cash and "under the table," during his employment. (Doc. 7-10 at 2). He "regularly" worked over 40 hours a week, according to the 6-day schedule identified by Totte. Oil change

---

[6] This differs from the $350 amount identified by plaintiffs in the complaint.

7

technicians at each location worked under this schedule. Until the end of 2015, Quick Lane "only paid a flat rate of pay per week to all of [its] workers at [its] oil change shops." Hitch states "I believe that my employers have a policy of not compensating employees for all hours worked," including overtime. (*Id.*).

### C. Arguments

#### 1. In Support of Motion

Plaintiffs say the employee declarations, time sheets and paystubs demonstrate a "company-wide policy and practice" by defendants to underpay oil change technicians for hours worked, in violation of the FLSA. They note that Totte spent time working at each location of Quick Lane and was paid in the same manner, giving him "reason to believe" the pay and hour policies were company-wide. Plaintiffs say they are "similarly situated" with other technicians at Quick Lane because of a common "policy or practice of not paying the statutorily mandated minimum wage and overtime wage rates."

#### 2. Response

In response, defendants note that no plaintiffs have opted in to this case in the 6 months it has been pending. Because there is no demonstrated "interest" by potential plaintiffs, they say there is no need for a collective action, citing *Arrington v. Michigan Bell Tel. Co.*, 2011 WL 3319691, at *5 (E.D. Mich. 2011) (Lawson, J.).

Defendants say plaintiffs have not shown they are "similarly situated" with other technicians at Quick Lane. First, they have not shown a common policy or plan. Defendants cite differences in the treatment of pay and hours for each plaintiff. Totte was paid by check for 40 hours regardless of hours worked, Hitch "under the table" in cash, and Merrell by check for less than 40 hours when he worked more. Defendants

say there can be no common policy in light of these distinctions.  Second, plaintiffs have not shown their job duties were similar.  Totte was a manager and exempt, Hitch a "greeter" who did not perform oil changes, and Merrell a technician.

Defendants say Totte and Hitch's stated beliefs in their declarations as to other employees, based on observations and discussions with coworkers, are irrelevant because they are conclusory assertions devoid of factual content.

### 3.     Reply

Plaintiffs reply that the FLSA does not require proof of "interest" by potential plaintiffs of opting in to a collective action before one is certified.  In support, plaintiffs cite *Shipes v. Amurcon Corp.*, 2012 WL 995362, at *8 (E.D. Mich. 2012) (Roberts, J.) reasoning otherwise, and explain *Arrington* does not stand for the asserted proposition.

Plaintiffs reassert that there is a "common policy or plan" of Quick Lane with respect to paying technicians.  Despite the differences among them cited, plaintiffs note that "at the core of [their] positions they [] performed oil change duties and were subject to the same employment conditions" as other technicians.

## V.     DISCUSSION

### A.     Evidence of Facial FLSA Violations as to Plaintiffs

After consideration of the time sheets, paystubs and wage-hour matrices, the Court finds plaintiffs have offered evidentiary support for facial violations of the FLSA.

### 1.     Totte

The matrices for Totte do not align.  Review of time sheets confirms defendants' version of his hours for 2015.[7]  It is unclear where the greater number of hours reflected

---

[7] Time sheets have not been produced for 2013 or 2014.

in plaintiffs' matrix came from. Likewise, review of paystubs confirms plaintiffs' version of Totte's pay. Defendants attribute the $700 in their matrix to cash payments of $250 beyond the $450 paid to Totte by check. There is no evidence of these payments.

Based on paystubs reflecting weekly pay of $450 for 2015 and time sheets reflecting weekly hours ranging from 55 to 62, there is a facial violation of the FLSA with respect to payment of minimum wage plus overtime to Totte.

### 2.     Hitch

The parties agree that Hitch was paid a weekly salary in cash but dispute the amount—plaintiffs say $350 and defendants $450. There is no documentation to confirm either version. The matrices align on hours worked, which are confirmed by review of the relevant time sheets.

Based on a weekly salary of *either* $350 or $450, and time sheets reflecting weekly hours ranging from 55 to 64, there is a facial violation of the FLSA with respect to payment of minimum wage plus overtime to Hitch.

### 3.     Merrell

The parties do not agree on the form of Merrell's pay. Plaintiffs say he was paid hourly by check. Defendants say he was paid in two components—part hourly by check and part in cash—to make a weekly salary of $650 in 2016. The matrices align on hours worked, confirmed by review of time sheets, but diverge on pay over the disputed cash component. There is no evidence of the cash payments.

The paystubs reflect hours that are less than the hours shown on the time sheets undisputed by the parties. For instance, in the first row for a check dated April 11, 2016, Merrell worked 56.45 hours according to the time sheet but was paid by check for only

27.75 hours. The corresponding amount of pay ($242.81) does not cover minimum wage or overtime. There is a facial violation of the FLSA as to Merrell.

### B.  Evidence of Oil Change Technicians "Similarly Situated"

In addition to the evidentiary support for facial violations of the FLSA, plaintiffs offer evidence sufficient to establish a colorable claim that a collective action of "similarly situated" oil change technicians exists at each Quick Lane location. Thus, they have met the "fairly lenient" evidentiary standard for conditional certification.

#### 1.  Common FLSA-Violating Policy or Plan

Plaintiffs have offered evidence to suggest a common policy or plan by Quick Lane in compensating its oil change technicians. Totte in his declaration stated that he had worked at each location of Quick Lane and was paid in the same manner. This suggests that pay practices did not vary across location. Totte and Hitch attested to the existence of a 6-day schedule of shifts by which all oil change technicians abided. This suggests that oil change technicians would have worked and reported a similar number of hours each week. Totte described how he came to know other technicians were paid in the same way based on negotiations with coworkers over shifts and conversations about pay while working shifts. This is a plausible basis for such knowledge.

It can be expected that like employees are paid in the same manner, absent a reason for differential treatment. Defendants offer nothing to dispel this view, and plaintiffs have provided evidence tending to confirm it.

Defendants correctly note that there are differences in the treatment of pay and hours between each plaintiff. However, defendants do not explain why these differences are relevant to proving an FLSA claim. For instance, Hitch was paid a

11

weekly salary in cash that did not correspond to all hours worked whereas Merrell was paid hourly by check for fewer hours than he worked. In both cases the effect was the same—underpayment based on hours worked. This fits the mold of plaintiffs' claims to warrant further scrutiny. Moreover, such differences are better managed later. *See Wlotkowski v. Michigan Bell Tel. Co.*, 267 F.R.D. 213, 219 (E.D. Mich. 2010) (Edmunds, J.) ("Defendant's arguments about the predominance of individualized inquiries and dissimilarities between plaintiff and other employees are properly raised after the parties have conducted discovery and can present a more detailed factual record for the court to review." (citation omitted)).

Plaintiffs need not show they are "identical" in every—or any—respect, only that they are "similar" in respects material to proving an FLSA claim. They have done that.

### 2.     Common Legal Theory

There are material similarities in the legal theory asserted by plaintiffs as to how oil change technicians were underpaid by Quick Lane. Defendants admit that for each plaintiff there was a cash component to their pay and that the hours reflected on paystubs (where available) do not match those reported on time sheets. These are core elements in plaintiffs' claim of how Quick Lane underpaid them and other oil change technicians. Defendants' admissions, combined with the fact that time sheets and paystubs of plaintiffs reflect pay below required wages, support the existence of a common legal theory of underpayment for all oil change technicians under the FLSA.

It may be, as defendants assert, that each employee was paid properly when accounting for all cash payments. However, there is no evidence of the cash payments, and plaintiffs do not acknowledge them where relevant. At this stage, the possibility that

plaintiffs were paid additional monies does not alter the legal theory of how defendants' payment scheme violated the FLSA.

### 3. *Arrington*

Defendants' reliance on *Arrington* is misplaced. In that case, plaintiffs failed to offer any evidentiary support for stated beliefs in declarations that other employees were misclassified as managers to avoid paying overtime. *Arrington*, 2011 WL 3319691, at *5-6. Moreover, defendants offered survey data from 125 employees included in the proposed collective action reporting circumstances that did not suggest misclassification in the way identified by plaintiffs. *Id.* at *3.

As discussed above, this case presents evidence to suggest the existence of a common policy and there are material similarities in the legal theory of how oil change technicians were underpaid. Defendants have not offered evidence to either rebut plaintiffs' showings in this regard or the existence of a common policy or legal theory.

### C.  Disputed Facts

It is clear there are disputes of material fact here. The most notable is the dispute over whether components of plaintiffs' pay were cash payments, and, if so, in what amount. The amount of cash payments made by defendants to plaintiffs bears on liability—whether the total pay was large enough to compensate employees for all hours worked. Another is the dispute over Hitch's job. Plaintiffs say he was an oil change technician while defendants say he was a "greeter" of customers—the former would keep Hitch in the proposed collective action while the latter would remove him from it.

The Court need not decide such issues of disputed fact, or make substantive determinations, at this stage. They will be explored in due course as the case develops.

SO ORDERED.

                                                <u>s/Avern Cohn</u>
                                                AVERN COHN
                                                UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2017
       Detroit, Michigan